UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

MAY 11 2026 AM11:28
FILED-USDC-CT-NEW_HAVEN

|  |  |  |  |
|---|---|---|---|
| _____ ) | | | |
| Rosa Lee Klaneski, | ) | | |
| Plaintiff, | ) | | |
| v. | ) | Civil Action No. _____ | |
| Direxion Shares ETF Trust, | ) | | |
| Defendant. | ) | | |
| _____ ) | | | |

## COMPLAINT

Plaintiff Rosa Lee Klaneski, for her Complaint against Direxion Shares ETF Trust ("Direxion"), alleges, on knowledge as to her own actions, and otherwise upon information and belief, as follows:

## PARTIES

1.      Plaintiff Rosa Lee Klaneski ("Plaintiff") is an individual who resides in the City of Farmington, County of Hartford, State of Connecticut. Plaintiff is a citizen of the State of Connecticut.

1

2. Upon information and belief, Defendant Direxion Shares ETF Trust ("Defendant") is a statutory trust with its principal place of business at 535 Madison Avenue, 37th Floor, New York, New York 10022.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the federal securities laws, including 15 U.S.C. § 77k(a) and 15 U.S.C. § 77l(a)(2). Supplemental jurisdiction exists over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy as the federal claims.

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## STATEMENT OF FACTS

5. Plaintiff purchased and held shares of Direxion exchange-traded funds, including SOXS during 2025.

6. Plaintiff experienced investment losses in connection with her ownership of Direxion ETF "SOXS" during 2025.

2

7. Plaintiff's total investment losses tied to Direxion ETF SOXS during the period was $16,249.90.

8. Plaintiff's Morgan Stanley Form 1099-B for the relevant period shows SOXS losses totaling $16,249.90, including a wash sale loss of $13,214.04 disallowed, from trades totaling $1,028,995.67 with a cost basis of $1,045,245.57.

9. Direxion issues prospectuses and supplements for its ETFs, including a Supplement dated February 4, 2026 and a Prospectus dated February 27, 2026, and incorporates the Statement of Additional Information (SAI) by reference.

10. Direxion's public materials for SOXS state that the performance graph and table do not reflect the deduction of taxes on distributions or redemption and direct investors to the prospectus website.

11. Direxion's prospectuses emphasize that fund distributions may be taxed as ordinary income or long-term capital gains, may be subject to federal, state, and local taxes, and that after-tax returns are not relevant for tax-deferred accounts.

12. Direxion's prospectuses refer investors to the SAI section "Dividends, Other Distributions and Taxes" for more information.

13. The Prospectus and SAI do not mention or discuss wash sale, wash-sale, Section 1091, or any disallowance of losses on substantially identical securities while simultaneously extensively discussing consequences of holding the security longer than a day which implies churning and repeated fund purchases in trading.

3

14. The reverse split supplement in the SAI addresses tax consequences only for cash redemptions of fractional shares from reverse splits and otherwise states no taxable transaction results, without addressing wash sale treatment.

15. The SAI lists a "Dividends, Other Distributions and Taxes" section in its table of contents, but does not provide information on wash sales.

16. The February 4, 2026 reverse split supplement and the February 27, 2026 Prospectus do not mention or discuss wash sale loss disallowance rules.

17. The supplement limits tax discussion to cash redemptions of fractional shares from reverse splits and states other aspects of the reverse splits are not taxable.

18. The Prospectus addresses fund-level tax risk, RIC qualification, distributions taxed as ordinary income or long-term capital gains, and potential lack of tax efficiency from cash creations or redemptions, without referencing wash sale rules.

19. Neither the SAI nor the Prospectus provides guidance on shareholder-level loss disallowance from selling fund shares and repurchasing substantially identical securities within 30 days.

20. Neither the SAI nor Prospectus provides wash sale explanations, examples, or cross-references to detailed tax sections.

21. The absence of wash sale discussion in these documents fails to alert investors to the risk that losses may be disallowed and basis adjusted when rapidly re-entering positions or switching among substantially identical leveraged or inverse funds.

4

22.    The Prospectus text includes general Tax Information and Tax Risk related to RIC qualification, distributions, and after-tax return illustrations, but does not mention wash sales under Section 1091 or related disallowance mechanics.

23.    Neither the SAI nor the Prospectus mentions wash sale or any description of loss disallowance from repurchasing substantially identical securities within the statutory window.

24.    General Tax Risk disclosures in these documents focus on RIC qualification, distributions, and potential corporate-level taxation, without granular investor-level wash sale guidance.

25.    There is no discussion of wash sale disallowance, IRS wash sale rules, or related tax-loss disallowance mechanics in the Prospectus.

26.    Neither the SAI nor the Prospectus provides wash sale explanations, examples, or cross-references to detailed tax sections sufficient for trading-oriented products.

27.    Bear funds disclose Cash Transaction Risk with reduced tax efficiency from cash creations or redemptions that may trigger fund-level gains, but still do not reference wash sale rules.

28.    Omitting wash sale disallowance leaves investor-level loss denial mechanics unaddressed in both the Prospectus and the SAI.

29.    The Prospectus's Taxes section states that all or a portion of any loss on a sale or exchange of fund shares is disallowed to the extent other shares of the same fund are purchased within a 61-day window and explains that, when a wash

sale occurs, the basis in newly purchased shares is adjusted to reflect the disallowed loss.

30.     This limited discussion of wash sale rules lacks examples, cross-fund or cross-account aggregation nuances, dividend reinvestment interactions, and broker reporting mechanics. The omission of the following tends to mislead the prudent investor:

a.     Neither document provides a detailed wash sale description—the materials do not provide a substantive explanation of the wash sale rule as it applies to shareholder transactions in the funds. The SAI provides no discussion of the 61-day window mechanics, "substantially identical" standards, basis deferral mechanics beyond a single reference, or operational nuances for fund shares. The Prospectus does not address or explain the wash sale rule as it applies to shareholder transactions in the funds.

b.     Neither document provides worked examples—the materials contain no worked examples illustrating how the wash sale rule could apply to transactions in fund shares.

c.     There is no cross-fund or cross-account aggregation guidance—the materials do not address whether wash sale determinations aggregate across related or "substantially identical" funds, nor how to treat positions held across different brokers or accounts. The Prospectus and SAI do not address cross-fund or cross-account aggregation for wash sale purposes, nor do they discuss

treatment of identical or substantially identical securities across related funds or positions held at different brokers or accounts.

d.      There is no dividend reinvestment interaction—the materials do not explain whether or how automatic dividend reinvestment can trigger or interact with wash sale treatment.

e.      There are no broker reporting mechanics—the materials do not describe how brokers report wash sales on Form 1099-B, do not address covered vs. noncovered shares, lot-level basis tracking, cross-account limitations, or basis/holding-period reporting adjustments related to wash sales.

f.      There is only a brief allusion to wash sale effects without operational detail—only one passage notes that wash sale rules can disallow losses if substantially identical shares are acquired within a 61-day window and that the disallowed loss is added to the basis of newly acquired shares. There is no elaboration beyond this single statement in documents spanning several hundreds of pages and designed to be bought and held for very short periods of time.

31.     Plaintiff alleges that Direxion's offering materials also omitted material investor-level tax rules for sales or redemptions of fund shares, including gain or loss recognition, holding period, and character, beyond a narrow reference to fractional share redemptions in reverse splits.

32.     The Prospectus and SAI omit the following as they relate to Investor-level rules on sales and redemptions of fund shares:

a.      A detailed computation of holding period (start dates, lot-level conventions, DRIP effects, corporate actions) is not provided and the documents

7

fail to address how an investor's holding period in fund shares is determined for tax purposes;

b.      Comprehensive rules for redemptions beyond the general recognition and character statements (e.g., in-kind vs. cash nuances for non-Creation Unit shareholders) are not articulated; and

c.      Broker-level 1099-B mechanics for reporting sales/redemptions, covered vs. noncovered distinctions, and cross-account basis/holding-period continuity are not addressed.

33.     Plaintiff alleges that Direxion's offering materials omitted whether distributions may constitute return of capital, related basis adjustments, and effects on subsequent gain recognition at the investor level.

34.     Plaintiff alleges that the high-level prospectus tax section and financial highlights acknowledge return of capital and its circumstances, but multiple prospectus sections and the SAI do not, creating an omission/inconsistency in where and how return of capital is disclosed. While the Prospectus notes the ROC rule (excess reduces basis, then capital gain once basis is zero), it omits the following:

a.      There is no explanation connecting prior basis reductions from ROC to the magnitude or timing of gain when the investor later sells, redeems, or exchanges shares (e.g., that reduced basis would generally increase taxable gain on disposition);

8

b.    No guidance is provided on basis allocation or adjustments in corporate actions (e.g., reverse splits) that would affect future gains, apart from noting potential gain or loss only for fractional-share cash-outs;

c.    Numerous tax and distribution sections provide only high-level character descriptions (ordinary income/long-term capital gains) and do not address investor-level basis mechanics or their impact on later recognition;

d.    The SAI likewise does not explain how basis adjustments affect gain recognition on later dispositions.

35.    Given that, the Prospectus and SAI materials do not link ROC-driven basis reductions to subsequent gain recognition outcomes on sale, redemption, or exchange, leaving a gap on investor-level consequences beyond the zero-basis capital gain rule.

36.    Plaintiff alleges that Direxion's offering materials did not explain investor-level characterization or timing of derivative-related income, including ordinary versus capital, Section 1256, and straddle rules.

37.    The materials describe derivative tax regimes at a high level but do not translate them into what a shareholder will actually recognize, when they will recognize it, or whether it will be ordinary income or capital gain/loss, which leaves a prudent investor unable to anticipate tax outcomes tied to the security's derivative exposure.

38.    Although Section 1256 is mentioned (mark-to-market, 60/40 character), the materials are not operationalized for shareholders and do not provide

9

investor-facing mechanics, covered-contract mapping, or year-end timing and reporting implications.

39.    What is stated in the SAI is that certain contracts may be marked to market at year-end and subject to 60% long-term/40% short-term treatment, however this fails prudent investor detail in the following ways:

a.    With respect to Mark-to-market mechanics, there is no explanation of how year-end deemed sales flow from fund-level recognition to an investor's Form 1099, nor any worked examples;

b.    With respect to 60/40 character allocation, there is no translation of 60/40 into the character of distributions that shareholders receive or illustrations of after-tax impact;

c.    With respect to the scope of covered contracts, there is no mapping of the funds' commonly used instruments to 1256 coverage so investors can understand ongoing exposure; and

d.    With respect to year-end timing and cash-flow effects, while acknowledging mark-to-market can increase distributions without increasing available cash, the materials do not specify when or how that appears for shareholders.

40.    The Prospectus contains parallel gaps as it provides only generic RIC/distribution tax language and omits 1256 specifics—no investor-level mark-to-market, 60/40, covered-contract scope, or year-end timing guidance.

10

41.    The Prospectus and SAI mention section 1092 imputing straddles without actually defining the term: the documents note loss deferral to the extent of unrecognized gain on offsetting positions, and reference related wash-sale and short-sale rules, and they also note few regulations and resulting uncertainty, however this fails prudent investor detail in the following ways:

a.    With respect to loss deferral mechanics, there is no explanation of how to compute, track, or time deferrals at the investor level, or how fund-level deferrals affect shareholder distributions and Form 1099 reporting;

b.    With respect to holding-period adjustments, there is no investor-level explanation of how holding periods are suspended/adjusted or how character might be reclassified on distributions;

c.    With respect to interactions with wash sales/offsetting positions, there is no operational guidance for typical investor scenarios or how shareholder transactions could interact with fund-level positions; and,

d.    There are no examples or computations included, and no practical scenarios articulated showing deferral calculations, recognition triggers, or downstream reporting to investors.

42.    The Prospectus and SAI mention ordinary income or capital gain/loss characterization and timing and acknowledge that the funds use derivatives extensively and note that derivative regimes (e.g., 1256, straddles) can affect timing and character at the fund level; distributions are made at least annually and may be required even without cash. This fails prudent investor detail in the following ways:

11

a.      There is no bridge from fund-level to shareholder outcomes—the materials do not clarify when investors will recognize income, or whether it will be ordinary dividends, short-term capital gain, or long-term capital gain—particularly for swaps, futures, and options;

b.      There is no timing roadmap—there is no plain-language explanation of intra-year versus year-end recognition, including mark-to-market effects and how they appear on 1099s;

c.      Instrument-specific characterization is missing—swap and forward sections address operational risks, not whether periodic or termination payments will be ordinary or capital to shareholders, or when;

d,      Prospectus gaps reinforce the problem—generic statements that distributions may be ordinary income or long-term capital gains are not tied to derivative instruments or their reporting cadence and there is no derivative-to-distribution mapping or timing mechanics;

e.      There is no translation despite heavy derivatives use—the Prospectus emphasizes that derivatives are central to strategy yet provides no characterization/timing mapping for shareholder reporting, even as it notes potential tax inefficiency and uncertainty.

43.    As a result, the practical consequences for a prudent investor is the fund provides unclear risk exposure in its publicly-filed SEC materials: without investor-level explanations of 1256 mechanics, straddle deferral and holding-period rules, or instrument-specific characterization/timing, investors

12

cannot anticipate whether derivative-driven returns will primarily be ordinary income or capital gain, nor when amounts will be recognized and reported.

44.    Additionally, because the documents feature no examples, computations, or a reporting roadmap, this absence of worked examples, calendars, or 1099 mapping prevents prudent planning around cash flows, estimated taxes, and year-end distributions, which is particularly unfair for funds that plainly frequently rebalance or rely on daily derivative exposures.

45.    Plaintiff further alleges that Direxion's offering materials omitted disclosures on non-U.S. withholding, FATCA, and Form 1099 reporting categories, and offered only generic statements on potential state and local taxes without guidance on state/local conformity or nuances.

46.    With respect to non-U.S. withholding, the operative documents are missing country-level mechanics and investor impact. While the Prospectus and SAI acknowledge that foreign-source dividends, interest, or gains "may be subject to income, withholding, or other taxes imposed by foreign countries and U.S. possessions," the documents are missing the following:

a.    There are no country-by-country rates, treaty-reduced rates, or examples; no disclosure of whether the funds pursue relief-at-source or reclaims, expected timelines, costs, success rates, or whether reclaims accrue to NAV, leaving investors unable to evaluate expected tax drag or tracking error.

13

b.      There is no statement whether the funds will elect to pass through foreign taxes paid or how shareholders would receive information to claim credits, obscuring potential after-tax outcomes;

c.      There is no linkage between non-U.S. withholding and distributions/NET performance for these strategies, preventing assessment of yield impact;

d.      The materials similarly lack withholding mechanics, pass-through, or performance effects despite non-U.S. market exposure and derivatives, leaving key risks unquantified;

e.      Derivatives sections do not address whether payments under swaps or similar instruments could face non-U.S. withholding, leaving a gap on return erosion channels; and,

f.      FATCA discussion is U.S.-focused and does not substitute for non-U.S. source withholding disclosures.

47.    The effect on the prudent investor of the omissions are that the non-U.S. withholding and treaty gaps prevent investors from estimating cross-border tax leakage, eligibility for relief, and effects on distributions and tracking—core inputs to after-tax performance.

48.    With respect to FACTA, the documents provide a high-level mention without mechanics, triggers, or cash-flow consequences by offering a brief overview of FATCA and the 30% withholding framework, and therefore without being violative of principles of fairness the documents fail to address the following:

a.      There is no clarity on which payments could be subject to FATCA withholding beyond "income dividends," creating ambiguity around scope (e.g., redemption proceeds or other withholdable payments);

b.      There is no note of fund-level operational impacts (e.g., how noncompliance by investors/intermediaries could reduce portfolio income or increase costs), hindering assessment of NAV and distribution risk;

c.      There are no documentation requirements, cure/remediation processes, or investor recourse if withholding occurs; investors cannot gauge cash-flow timing and recovery risk;

d.      There is no explanation of treaty interactions or limitations relevant to FATCA withholding, leaving cross-border investors without guidance; and,

e.      There are no policies/procedures for FATCA compliance or how intermediaries/derivatives and securities lending activities might be affected, masking potential leakage channels.

49.     For the prudent investor, such FATCA omissions obscure potential 30% withholding, documentation obligations, remediation, and intermediary risks, impeding evaluation of cash-flow volatility and NAV impacts.

50.     Additionally, the documents fail to map fund events to 1099 boxes or forms and instead offer only high-level descriptions of distribution taxation and RIC qualification; a reverse split note indicates cash in lieu may create gain or loss. Substantively, the disclosures:

15

a.      fail to identify which 1099 forms will be furnished (e.g., 1099-DIV vs. 1099-B) or the applicable boxes (ordinary vs. qualified dividends, capital gain distributions, return of capital, foreign tax paid, backup withholding);

b.      provide no explanation of 1099-B cost basis, proceeds, wash sale adjustments, or how reverse-split cash-in-lieu is reported—obscuring compliance and after-tax planning; and

c.      the SAI does not provide box-level or form-level reporting details despite derivatives-heavy strategies that can materially affect categorization and timing.

51.     For the prudent investor, such Form 1099 reporting gaps leave investors without process mechanics and reporting expectations, hindering compliance planning and projection of tax liabilities from year-end forms.

52.     With respect to State and local tax guidance, the Prospectus and SAI provide a federal-only framing with no jurisdiction-specific analysis, stating only that distributions are subject to federal income tax and may also be subject to state and local taxes, and after-tax returns shown use federal rates and do not reflect state/local impacts. The documents materially omit the following:

a.      There is no discussion of how states treat ordinary income, capital gains, or dividends; no guidance on conformity, exemptions (e.g., U.S. government interest), credits, sourcing rules, or nonresident withholding/filing implications—preventing evaluation of total tax drag and compliance burdens; and,

16

b.      There is no treatment of derivatives/shorting at the state level, despite strategy centrality, leaving potential character and sourcing differences unaddressed.

53.     Such State/local tax silence prevents prudent investors from assessing jurisdiction-specific tax drag, credits, and filing obligations, which can materially alter after-tax returns.

54.     Plaintiff further alleges that Direxion's offering materials lacked discussion of corporate action tax mechanics and issuer/broker basis and lot reporting to investors.

55.     What the documents state is a description of reverse stock splits and that fractional shares will be redeemed for cash, which may result in gain or loss; otherwise, the reverse split is not taxable, and the timing and operational execution are noted, and it clearly identifies multiple historical reverse splits identified in financial highlights.

56.     The Plaintiff alleges the materials omit investor-level basis reallocation and holding-period tacking rules for reverse splits, characterization/measurement for cash-in-lieu proceeds, mechanics for reorganizations, mergers, or spin-offs, and any Form 8937 references or any practical reporting guidance from the documented corporate tax mechanics of SOXS ownership.

57.     In terms of the basis/lot reporting, the SAI states Covered Shares basis reporting applies, the default is the average-basis method unless another acceptable method is elected, and the method cannot be changed after settlement

17

of a redemption of Covered Shares. The Prospectus states a shareholder who wants an average basis for Covered Shares must elect it in writing with the broker, and that investors may choose another IRS-acceptable method and should consult brokers.

58.    The Plaintiff alleges that the Prospectus and SAI omits definitions and treatment of covered vs. noncovered shares; default methods where no election is made; detailed lot-relief methods (FIFO, specific identification, HIFO), elections/changes and deadlines; Form 1099-B mechanics (boxes, wash-sale adjustments, basis transfers); and broker vs. issuer responsibilities, especially for ETF secondary-market trades and DTC movements.

59.    The result is that both the Prospectus and SAI provide only high-level notes and neither provides investor-usable mechanics for basis/lot reporting or detailed corporate-action tax computations.

60.    Plaintiff asserts that these omissions in toto as articulated caused investors, including Plaintiff, to purchase and hold Direxion ETFs without material information necessary to evaluate a variety of after-tax outcomes.

61.    Plaintiff asserts that the omissions resulted in unanticipated tax liabilities, disallowed losses, basis adjustments, withholding, reduced after-tax returns, and compliance costs all to her detriment.

**CAUSES OF ACTION**

## COUNT ONE:
## VIOLATION OF THE SECURITIES ACT OF 1933
## (15 U.S.C. § 77k(a))

62.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

63.    Defendant Direxion Shares ETF Trust offered and sold shares of its exchange-traded funds to the public through its Prospectus and SAI that omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to the non-exhaustive list of omissions as follows:

a.    a wash sale discussion or any information on Section 1091 or related disallowance mechanics, cross-fund or cross-account aggregation nuances, dividend reinvestment interactions, and broker reporting mechanics, with only a limited reference to wash sale rules lacking a substantive explanation of the wash sale rule as it applies to shareholder transactions in the funds, no discussion of the 61-day window mechanics, "substantially identical" standards, basis deferral mechanics beyond a single reference, nor operational nuances for fund shares.

b.    investor-level tax rules for sales or redemptions of fund shares—including a lack of a detailed computation of holding period (start dates, lot-level conventions, DRIP effects, corporate actions) and character;

c.    whether distributions may constitute return of capital and material ROC considerations—such as an explanation connecting prior basis reductions

19

from ROC to the magnitude or timing of gain when the investor later sells, redeems, or exchanges shares and how basis allocation or adjustments in corporate actions (e.g., reverse splits) that would affect future gains;

d.  Section 1256 materials—such as no explanation of how year-end deemed sales flow from fund-level recognition to an investor's Form 1099, nor any worked examples, no translation of 60/40 into the character of distributions that shareholders receive or illustrations of after-tax impact, no mapping of the funds' commonly used instruments to 1256 coverage, and no reference to year-end timing and cash-flow effects and how this appears for shareholders;

e.  ordinary income vs. capital gain/loss characterization—such as failing to clarify when investors will recognize income, or whether it will be ordinary dividends, short-term capital gain, or long-term capital gain—particularly for swaps, futures, and options, no plain-language explanation of intra-year versus year-end recognition, including mark-to-market effects and how they appear on 1099s, no instrument-specific characterization and no translation despite heavy derivatives use;

f.  non-U.S. withholding—no country-by-country rates, treaty-reduced rates, or examples; no disclosure of whether the funds pursue relief-at-source or reclaims, expected timelines, costs, success rates, or whether reclaims accrue to NAV, no statement whether the funds will elect to pass through foreign taxes paid or how shareholders would receive information to claim credits, no linkage between non-U.S. withholding and distributions/NET performance for these

20

strategies, no quantification of withholding mechanics, pass-through, or performance effects despite non-U.S. market exposure and derivatives, and no information on whether payments under swaps or similar instruments could face non-U.S. withholding;

g.      FACTA—no clarity on which payments could be subject to FATCA withholding beyond "income dividends," creating ambiguity around scope (e.g., redemption proceeds or other withholdable payments), no note of fund-level operational impacts (e.g., how noncompliance by investors/intermediaries could reduce portfolio income or increase costs) hindering assessment of NAV and distribution risk, no documentation requirements, cure/remediation processes, or investor recourse if withholding occurs, no explanation of treaty interactions or limitations relevant to FATCA withholding, and no policies/procedures for FATCA compliance or how intermediaries/derivatives and securities lending activities might be affected;

h.      1099 form information—no map of fund events to 1099 boxes or forms, failure to identify which 1099 forms will be furnished (e.g., 1099-DIV vs. 1099-B) or the applicable boxes (ordinary vs. qualified dividends, capital gain distributions, return of capital, foreign tax paid, backup withholding), no explanation of 1099-B cost basis, proceeds, wash sale adjustments, or how reverse-split cash-in-lieu is reported, and no box-level or form-level reporting details despite derivatives-heavy strategies;

21

i.      Interplay of state taxes—no discussion of how states treat ordinary income, capital gains, or dividends, no guidance on conformity, exemptions (e.g., U.S. government interest), credits, sourcing rules, or nonresident withholding/filing implications, and, no treatment of derivatives/shorting at the state level, despite strategy centrality;

j.      Corporate action tax mechanics—no investor-level basis reallocation and holding-period tacking rules for reverse splits, characterization/measurement for cash-in-lieu proceeds, mechanics for reorganizations, mergers, or spin-offs, and no Form 8937 references or any practical reporting guidance; and,

k.      issuer/broker basis and lot reporting to investors—no definitions and treatment of covered vs. noncovered shares, default methods where no election is made; detailed lot-relief methods (FIFO, specific identification, HIFO), elections/changes and deadlines, Form 1099-B mechanics (boxes, wash-sale adjustments, basis transfers), and broker vs. issuer responsibilities, especially for ETF secondary-market trades and DTC movements.

The scope and nature of these material omissions rendered the registration statements materially false or misleading at the time of the offer and sale of the securities.

64.     Plaintiff purchased shares of Direxion ETFs during the period in which the registration statements and prospectuses were in effect and was unaware of the omitted material facts relating to the after-tax collateral consequences of trading the security at the time of purchase.

22

65.     Plaintiff suffered damages as a result of the purchase of Direxion ETF shares at prices that were artificially inflated due to the material omissions in the registration statements and prospectuses.

66.     By reason of the foregoing, Defendant is liable to Plaintiff in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## COUNT TWO:
## VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934
## (15 U.S.C. § 77l(a)(2))

67.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

68.     Defendant Direxion Shares ETF Trust, by means of prospectuses and oral and written communications, offered and sold shares of its exchange-traded funds to Plaintiff by means of untrue statements of material fact and omissions of material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, including but not limited to the non-exhaustive list of omissions as follows:

a.     a wash sale discussion or any information on Section 1091 or related disallowance mechanics, cross-fund or cross-account aggregation nuances, dividend reinvestment interactions, and broker reporting mechanics, with only a limited reference to wash sale rules lacking a substantive explanation of the wash sale rule as it applies to shareholder transactions in the funds, no discussion of the

23

61-day window mechanics, "substantially identical" standards, basis deferral mechanics beyond a single reference, nor operational nuances for fund shares;

b.      investor-level tax rules for sales or redemptions of fund shares—including a lack of a detailed computation of holding period (start dates, lot-level conventions, DRIP effects, corporate actions) and character;

c.      whether distributions may constitute return of capital and material ROC considerations—such as an explanation connecting prior basis reductions from ROC to the magnitude or timing of gain when the investor later sells, redeems, or exchanges shares and how basis allocation or adjustments in corporate actions (e.g., reverse splits) that would affect future gains;

d.      Section 1256 materials—such as no explanation of how year-end deemed sales flow from fund-level recognition to an investor's Form 1099, nor any worked examples, no translation of 60/40 into the character of distributions that shareholders receive or illustrations of after-tax impact, no mapping of the funds' commonly used instruments to 1256 coverage, and no reference to year-end timing and cash-flow effects and how this appears for shareholders;

e.      ordinary income vs. capital gain/loss characterization—such as failing to clarify when investors will recognize income, or whether it will be ordinary dividends, short-term capital gain, or long-term capital gain—particularly for swaps, futures, and options, no plain-language explanation of intra-year versus year-end recognition, including mark-to-market effects and how they appear on

24

1099s, no instrument-specific characterization and no translation despite heavy derivatives use;

f.     non-U.S. withholding—no country-by-country rates, treaty-reduced rates, or examples; no disclosure of whether the funds pursue relief-at-source or reclaims, expected timelines, costs, success rates, or whether reclaims accrue to NAV, no statement whether the funds will elect to pass through foreign taxes paid or how shareholders would receive information to claim credits, no linkage between non-U.S. withholding and distributions/NET performance for these strategies, no quantification of withholding mechanics, pass-through, or performance effects despite non-U.S. market exposure and derivatives, and no information on whether payments under swaps or similar instruments could face non-U.S. withholding;

g.     FACTA—no clarity on which payments could be subject to FATCA withholding beyond "income dividends," creating ambiguity around scope (e.g., redemption proceeds or other withholdable payments), no note of fund-level operational impacts (e.g., how noncompliance by investors/intermediaries could reduce portfolio income or increase costs) hindering assessment of NAV and distribution risk, no documentation requirements, cure/remediation processes, or investor recourse if withholding occurs, no explanation of treaty interactions or limitations relevant to FATCA withholding, and no policies/procedures for FATCA compliance or how intermediaries/derivatives and securities lending activities might be affected;

25

h.      1099 form information—no map of fund events to 1099 boxes or forms, failure to identify which 1099 forms will be furnished (e.g., 1099-DIV vs. 1099-B) or the applicable boxes (ordinary vs. qualified dividends, capital gain distributions, return of capital, foreign tax paid, backup withholding), no explanation of 1099-B cost basis, proceeds, wash sale adjustments, or how reverse-split cash-in-lieu is reported, and no box-level or form-level reporting details despite derivatives-heavy strategies;

i.      Interplay of state taxes—no discussion of how states treat ordinary income, capital gains, or dividends, no guidance on conformity, exemptions (e.g., U.S. government interest), credits, sourcing rules, or nonresident withholding/filing implications, and, no treatment of derivatives/shorting at the state level, despite strategy centrality;

j.      Corporate action tax mechanics—no investor-level basis reallocation and holding-period tacking rules for reverse splits, characterization/measurement for cash-in-lieu proceeds, mechanics for reorganizations, mergers, or spin-offs, and no Form 8937 references or any practical reporting guidance; and,

k.      issuer/broker basis and lot reporting to investors—no definitions and treatment of covered vs. noncovered shares, default methods where no election is made; detailed lot-relief methods (FIFO, specific identification, HIFO), elections/changes and deadlines, Form 1099-B mechanics (boxes, wash-sale adjustments, basis transfers), and broker vs. issuer responsibilities, especially for ETF secondary-market trades and DTC movements.

26

69.     Plaintiff did not know, and in the exercise of reasonable care could not have known, of the omissions at the time of purchase which were apparent in tax documents received after trades settled.

70.     Plaintiff lacks an adequate remedy at law.

71.     By reason of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs, and such other equitable relief as the Court deems just and proper.

## COUNT THREE:
## VIOLATION OF THE CONNECTICUT UNIFORM SECURITIES ACT
## (C.G.S. § 36b-29(a)(2))

72.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 61 above as if fully set forth herein.

73.     Plaintiff propounds that the Defendant's investment product is violative of the principles of fairness articulated in CUSA because the Prospectus and SAI are misleading to the retail investor in that they fail to include the following non-exhaustive list of omissions required by a prudent investor to determine suitability of the fund:

        a.     a wash sale discussion or any information on Section 1091 or related disallowance mechanics, cross-fund or cross-account aggregation nuances, dividend reinvestment interactions, and broker reporting mechanics, with only a

limited reference to wash sale rules lacking a substantive explanation of the wash sale rule as it applies to shareholder transactions in the funds, no discussion of the 61-day window mechanics, "substantially identical" standards, basis deferral mechanics beyond a single reference, or operational nuances for fund shares;

b.       investor-level tax rules for sales or redemptions of fund shares—including a lack of a detailed computation of holding period (start dates, lot-level conventions, DRIP effects, corporate actions) and character;

c.       whether distributions may constitute return of capital and material ROC considerations—such as an explanation connecting prior basis reductions from ROC to the magnitude or timing of gain when the investor later sells, redeems, or exchanges shares and how basis allocation or adjustments in corporate actions (e.g., reverse splits) that would affect future gains;

d.       Section 1256 materials—such as no explanation of how year-end deemed sales flow from fund-level recognition to an investor's Form 1099, nor any worked examples, no translation of 60/40 into the character of distributions that shareholders receive or illustrations of after-tax impact, no mapping of the funds' commonly used instruments to 1256 coverage, and no reference to year-end timing and cash-flow effects and how this appears for shareholders;

e.       ordinary income vs. capital gain/loss characterization—such as failing to clarify when investors will recognize income, or whether it will be ordinary dividends, short-term capital gain, or long-term capital gain—particularly for swaps, futures, and options, no plain-language explanation of intra-year versus

28

year-end recognition, including mark-to-market effects and how they appear on 1099s, no instrument-specific characterization and no translation despite heavy derivatives use;

f.      non-U.S. withholding—no country-by-country rates, treaty-reduced rates, or examples; no disclosure of whether the funds pursue relief-at-source or reclaims, expected timelines, costs, success rates, or whether reclaims accrue to NAV, no statement whether the funds will elect to pass through foreign taxes paid or how shareholders would receive information to claim credits, no linkage between non-U.S. withholding and distributions/NET performance for these strategies, no quantification of withholding mechanics, pass-through, or performance effects despite non-U.S. market exposure and derivatives, and no information on whether payments under swaps or similar instruments could face non-U.S. withholding;

g.      FACTA—no clarity on which payments could be subject to FATCA withholding beyond "income dividends," creating ambiguity around scope (e.g., redemption proceeds or other withholdable payments), no note of fund-level operational impacts (e.g., how noncompliance by investors/intermediaries could reduce portfolio income or increase costs) hindering assessment of NAV and distribution risk, no documentation requirements, cure/remediation processes, or investor recourse if withholding occurs, no explanation of treaty interactions or limitations relevant to FATCA withholding, and no policies/procedures for FATCA compliance or how intermediaries/derivatives and securities lending activities might be affected;

29

h.      1099 form information—no map of fund events to 1099 boxes or forms, failure to identify which 1099 forms will be furnished (e.g., 1099-DIV vs. 1099-B) or the applicable boxes (ordinary vs. qualified dividends, capital gain distributions, return of capital, foreign tax paid, backup withholding), no explanation of 1099-B cost basis, proceeds, wash sale adjustments, or how reverse-split cash-in-lieu is reported, and no box-level or form-level reporting details despite derivatives-heavy strategies;

i.      Interplay of state taxes—no discussion of how states treat ordinary income, capital gains, or dividends, no guidance on conformity, exemptions (e.g., U.S. government interest), credits, sourcing rules, or nonresident withholding/filing implications, and, no treatment of derivatives/shorting at the state level, despite strategy centrality;

j.      Corporate action tax mechanics—no investor-level basis reallocation and holding-period tacking rules for reverse splits, characterization/measurement for cash-in-lieu proceeds, mechanics for reorganizations, mergers, or spin-offs, and no Form 8937 references or any practical reporting guidance; and,

k.      issuer/broker basis and lot reporting to investors—no definitions and treatment of covered vs. noncovered shares, default methods where no election is made; detailed lot-relief methods (FIFO, specific identification, HIFO), elections/changes and deadlines, Form 1099-B mechanics (boxes, wash-sale adjustments, basis transfers), and broker vs. issuer responsibilities, especially for ETF secondary-market trades and DTC movements.

30

74.    Plaintiff propounds the half-disclosure doctrine embedded in the language of § 36b-4(a)(2) is directly implicated: once the Defendant elects to discuss tax consequences comprehensively, the omission of any discussion surrounding wash sale disallowances and other material facts required for the prudent investor to choose funds renders those tax disclosures misleading in context.

75.    In addition to the unfairness of the wash sale descriptions in the investment materials, such omissions from a lengthy Prospectus with supplements and a SAI tend to oppress the retail investor in a manner the legislature intended for protection.

76.    Plaintiff was unaware of the nature and extent of the wash sale disallowance which could not be adequately gleaned from even a thorough review of the Prospectus and the SAI but apparent post-settlement in tax documents.

77.    In light of this fact and the additional inadequacies of the fund disclosures, the Plaintiff has been financially harmed through trading the Defendant's investment product and brings this complaint for redress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Rosa Lee Klaneski respectfully requests that this Court:

A.    On Count One, enter judgment in favor of Plaintiff Rosa Lee Klaneski and against Direxion Shares ETF Trust for damages in an amount to be determined at

31

trial, but not less than $16,249.90, together with prejudgment and post-judgment interest as permitted by law.

B.    On Count Two, enter judgment in favor of Plaintiff Rosa Lee Klaneski and against Direxion Shares ETF Trust for rescission and/or damages in an amount to be determined at trial, but not less than $16,249.90, together with prejudgment and post-judgment interest as permitted by law.

C.    On Count Three, enter judgment in favor of Plaintiff Rosa Lee Klaneski and against Direxions Shares ETF Trust for damages in an amount to be determined at trial, but not less than $16,249.90, together with prejudgment and post-judgment interest as permitted by law.

D.    Award Plaintiff Rosa Lee Klaneski her reasonable attorneys' fees and costs of suit as permitted by applicable law.

E.    Grant Plaintiff Rosa Lee Klaneski such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Plaintiff demands a jury trial of all issues so triable.

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that she is the Plaintiff in the above action, that the information contained in the complaint is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621. Executed at Farmington, CT on May 9, 2026.

32



Rosa Lee Klaneski
8 Farmington Meadow Drive
Farmington, CT 06032-2040
860-214-4000
rosaklaneski@outlook.com